IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No.: 3:11CR97–HEH |
| ) | Civil Action No.: 3:14CV32–HEH |
| CORY D. HARRIS, ) | |
| ) | |
| Petitioner. ) | |

## MEMORANDUM OPINION
(Petitioner's Motion to Vacate, Set Aside, or Correct Sentence
Pursuant to 28 U.S.C. § 2255)

Petitioner Cory D. Harris ("Harris"), a federal inmate, urges this Court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 based on his contention that he received ineffective assistance by his trial counsel. By Memorandum Opinion and accompanying Order issued on September 22, 2016 (ECF Nos. 78, 79, respectively), this Court dismissed Claims Two through Ten of Harris's 28 U.S.C. § 2255 Motion ("§ 2255 Mot.", ECF No. 67). The remaining claim focuses on the adequacy of trial counsel's representation during the course of plea negotiations. Specifically, Harris maintains that trial counsel provided "erroneous advice that led to rejection of plea." (§ 2255 Mot. ¶ 12.) Because material facts pivotal to the resolution of this claim are in dispute, this Court was unable to find conclusively, at the pleading stage, that Harris was entitled to no relief on this claim. *See* 28 U.S.C. § 2255(b). Accordingly, this Court conducted an evidentiary hearing on December 2, 2016, limited to whether Harris was competently counseled concerning his potential sentencing exposure under the U.S. Sentencing Guidelines, if convicted by a jury, and whether counsel failed to adequately pursue a

motion to suppress evidence seized from Harris's home. Harris asserts that trial counsel's deficient representation "led to a rejection of a favorable plea offer in which [Harris] proceeded to trial and received a harsher sentence...." (*Id.* at ¶ 12(a).)

As more fully explained in this Court's previous Memorandum Opinion, Harris was convicted by a jury of conspiracy to distribute and possession with the intent to distribute 280 grams or more of a mixture and substance containing a detectable amount of cocaine base (Count One); possession with the intent to distribute fifty grams or more of a mixture and substance containing a detectable amount of cocaine base (Count Two); two counts of possession of a firearm in furtherance of a drug trafficking crime (Counts Three and Four); and two counts of possession of a firearm by a convicted felon (Counts Five and Six). (*See* Superseding Indictment, ECF No. 12.)

On November 28, 2011, Harris was sentenced to a total of 600 months of imprisonment. Specifically, the Court sentenced Harris to 240 months on Count One, 240 months on Count Two, to be served concurrently with Count One, 60 months on Count Three, to be served consecutively, 300 months on Count Four, to be served consecutively, 100 months on Count Five, to be served concurrently, and 120 months on Count Six, to be served concurrently. The United States Court of Appeals for the Fourth Circuit affirmed Harris's convictions and sentences.

In Harris's remaining claim on his § 2255 Motion, he contends that his trial counsel gave "erroneous advice that led to rejection of plea." (§ 2255 Mot. ¶ 12.) Harris elaborates by maintaining that his attorney, James A. Bullard, Jr. ("Bullard"), advised him that "he could get all of the evidence suppressed and thrown out based on a Fourth

2

Amendment violation." (*Id.* at ¶ 12(a).) Relying on that advice, Harris claims that he rejected "the government's 10-year plea deal, went to trial and lost." (Pet'r's Reply at 5, ECF No. 80.) According to Harris, his attorney never advised him that he had a potential sentencing exposure of 600 months if convicted at trial on all six counts. (*Id.*) It was Harris's impression, based on conversations with his lawyer, that he was only facing eighteen years if convicted at trial. (*Id.* at 6.)

Bullard countered through the government's responsive pleading that after reviewing the state's search warrants and accompanying affidavits, he explained to Harris that he saw no basis for filing a motion to suppress. Moreover, Bullard maintained that Harris's "decision to reject the plea offer and proceed to trial was his alone, and was not connected to any advice given to him regarding any suppression motions." (Gov't's Resp. to Petition, Ex. 2 at ¶ 2, ECF No. 70–2.) To resolve the conflicting representations, this Court held an evidentiary hearing on December 2, 2016, as required by 28 U.S.C. § 2255(b). Following the hearing, each side was afforded an opportunity to file additional memoranda supporting their positions.[1]

On direct examination, Harris testified that it was his idea to file a motion to suppress, "[b]ased upon me sharing with him that the search warrant was illegally

---

[1] In its post-hearing memorandum, the government questions the Court's jurisdiction to entertain the plea advice component of Harris's § 2255 challenge as time barred. Harris's initial petition filed in 2014 raised only counsel's failure to argue a motion to suppress, not that he was unaware of the potential 600-month sentence. The latter issue was raised for the first time in 2016. Harris maintains that the issue of advice on sentencing exposure is merely an additional argument in support of his original claim of ineffective assistance of counsel. While a close issue, the Court accepts Harris's explanation.

3

obtained, and that they used false informant [sic] to obtain the search warrant."[2] (Hr'g Tr. 8:19-21, ECF No. 88.) Harris stated that his initial retained attorney declined to file a motion to suppress and encouraged Harris "to take a plea agreement instead of fighting it." (*Id.* at 10:11.) Harris decided to fire his first attorney and retain Bullard. (*Id.* at 9:23-10:22.)

Harris further explained that he was "open to a plea agreement," but apparently wanted to pursue the motion to suppress as a matter of principle, "[b]ecause I just wanted to shine some light on them violating my constitutional rights." (*Id.* at 10:15-19.) Harris amplified his reasoning on direct examination. "Actually, the guns and the drugs came to the house an hour and a half prior to them executing the search warrant." (*Id.* at 9:7-9.) Harris recounted that he explained to Bullard "what had happened as far as me bringing the drugs in the house, and then the affidavit stating that within 72 hours they had a reliable informant, which I know couldn't have been true." (*Id.* at 12:4-7.) According to Harris, Bullard explained to him that "an informant cannot come into my house without explaining with specificity the place where the drugs and guns could be found." (*Id.* at 11:18-20.) "That mean [sic] I had grounds to file a suppression motion." (*Id.* at 11:22-23.) This discussion apparently occurred at Harris's first meeting with Bullard.

---

[2] According to Harris, the City of Petersburg Police, along with a multi-jurisdictional task force, executed a warrant on one of his houses and recovered drugs and guns. (Hr'g Tr. 7:2-17.) Apparently, a second search warrant was executed at another location, which does not appear to be at issue.

When asked during the evidentiary hearing how he had become so knowledgeable about the law, Harris responded: "I've stayed in the law library every day since I first stepped foot into the . . . BOP." (*Id.* at 13:5-6.)

One month later, at their second meeting, Bullard spoke to Harris about a proposed plea agreement. (*Id.* at 14:15-24.) Harris acknowledged to Bullard that he was in fact guilty and that he admitted to law enforcement that he was the only person residing in the house that was searched.[3] (*Id.* at 15:9-18.) Harris indicated that his primary concern during that second meeting was discussing the potential motion to suppress the evidence seized. (*Id.* at 15:22-25.) Harris persisted in arguing that the drugs were not present on his premises seventy-two hours before the search warrant was executed. (*Id.* at 16:1-17:9.)[4] Harris did recall that Bullard informed him that "the plea was 10 years if I plead to Count 1 of the indictment. Count 2 and Count 3 would be dismissed." (*Id.* at 18:18-20.) According to Harris, Bullard indicated during the second meeting that he was still working on filing the motion to suppress. (*Id.* at 19:4-5.) Harris informed Bullard that he was unwilling to accept the plea offer at the time. When asked why, he responded "[b]ecause I ain't never did no time. I never really been in any real trouble. So, 10 years to me, away from my kids and family, sounded like life." (*Id.* at

---

[3] Harris clarified his reasoning by explaining that "my understanding is that me saying that this is my house automatically puts me under constructive possession." (*Id.* at 15:19-21.)

[4] This is a significant point of confusion on Harris's part. He testified that the drugs and guns came into the house an hour and one half prior to the search warrant being executed. (*Id.* at 9:7-9.) He erroneously construed the search warrant affidavit as stating that a reliable informant had observed drugs on his premises seventy-two hours prior. The affidavit revealed that the informant had made such observation *within* seventy-two hours of the issuance of the search warrant.

5

19:16-22.) He added, however, that if he had known that Bullard never intended to file the motion to suppress, he would have accepted the plea offer. (*Id.* at 19:23-20:3.)

At their next meeting, Bullard informed Harris that the government now had two witnesses willing to testify that Harris had sold them drugs. (*Id.* at 20:11-13.) Bullard advised Harris that if there is no plea agreement by June 8, the United States intended to supersede the initial indictment. (*Id.* at 21:2-14.) Harris testified that he again asked Bullard about the posture of the motion to suppress. (*Id.* at 21:24-25.) Harris testified that Bullard responded that he was working on it. (*Id.* at 22:1-2.) Harris still believed that the motion to suppress was his "best chance at winning in my pretrial stages. So if I take the plea, then I know I can't shine light on them violating my constitutional rights." (*Id.* at 22:3-8.)

Harris denied that Bullard, at that point, explained to him his increased sentencing exposure under the superseding indictment, particularly the potential effect of mandatory consecutive sentences. (*Id.* at 23:4-17.) Harris, however, acknowledged that Bullard informed him that as a result of the superseding indictment, he was facing additional charges and a substantially increased potential sentence. (*Id.* at 22:17-23; 48:3-10.) Harris conceded that his focus at that stage was still on the motion to suppress.

Harris characterized his relationship with Bullard at that point as involving a breakdown of communication. (*Id.* at 23:25.) When asked by the Court why he did not file a motion before trial seeking new counsel, he replied "[N]o, sir. Because he was a paid attorney." (*Id.* at 24:10-14.) Despite advising the Court at the sentencing hearing that Bullard had gone over the Presentence Report with him and explained the sentencing

6

guidelines, he steadfastly denied such conversation at the evidentiary hearing. (*Id.* at 25:21-26:15; 37:2-5.)

Somewhat inconsistent with his confident analysis and opinion of the legality of the search of his residence, Harris professed on cross-examination an inability to understand the penalty provisions when explained by the Court at the time of arraignment. (*Id.* at 30:11-23.) He maintained that he simply acknowledged an understanding of the charges and penalties because his lawyer advised him to say "Yeah." (*Id.* at 31:20-21.) He added that the penalty provisions were never explained to him. (*Id.* at 32:15-17.)[5]

The focal point of his recollection was being offered an opportunity to plead guilty to one count of the original indictment, with a recommended sentence of ten years. (*Id.* at 32:18-33:9.) If he knew he had no chance of winning the suppression hearing, Harris testified that he would have taken the ten-year deal. (*Id.* at 33:13-15.) At that initial stage, Harris admitted that he was more interested in prevailing on the motion to suppress than accepting the ten-year plea deal. (*Id.* at 34:1-16.) Once the superseding indictment was returned, Bullard explained to him that he was now facing around twenty years. (*Id.* at 36:9-11.) Neither during the trial nor after the return of the verdicts of guilty did Harris express concern to the Court about his lawyer's performance. (*Id.* at 36:17-37:1.) Harris also testified that Bullard never advised him that he was facing a possible sentence

---

[5] This testimony appears to be inconsistent with a recorded telephone conversation played during his trial (Trial Ex. 104A-2) in which he informed an associate that he was fully aware of the charges, but he "played stupid" at his arraignment. (Gov't's Response to Suppl. Br., Ex. 1, ECF No. 96-1.)

of 600 months. (*Id.* at 41:15-18.) If he had, Harris mentioned that he would have taken the ten-year deal. (*Id.* at 41:19-21.)

At the close of cross-examination, Harris restated that his entire decision to reject the ten-year plea deal was based on the promise of the suppression motion being argued. (*Id.* at 46:2-7.) According to Harris, he first learned that Bullard had no intention of arguing the motion to suppress on the morning of trial. (*Id.* at 44:3-6.)

On redirect examination, Harris emphasized that Bullard never explained to him that if he did not take the initial plea offer of ten years, he may be facing a significantly longer sentence. Bullard never told him, until the plea deal was off the table, that "if we don't take this plea deal, things might get worse." (*Id.* at 48:17-49:8.) Harris explained that even though the Court mentioned the potential for mandatory minimum sentences at the arraignment on the superseding indictment, it did not register with him. (*Id.* at 49:22-50:4.) He testified that it was unclear that the mandatory minimum sentences described by the Court would apply to him given his minimal prior record. (*Id.*) Furthermore, Harris maintained that Bullard never explained the sentencing guidelines and the effect of statutory penalties. (*Id.* at 50:11-18.)

Not surprisingly, Bullard's recollection of his conversations with Harris differed significantly. Bullard recalled that filing the suppression motion was a paramount concern for Harris. "I think that Mr. Harris was concerned about the conduct of the officers, and kind of how things had come about." (*Id.* at 53:16-18.) After reviewing the search warrant, Bullard remembered informing Harris that he did not believe there was a good faith basis to file a suppression motion. (*Id.* at 56:8-14.) It was apparent to Bullard

8

that Harris had independently researched the law and conferred with other people. (*Id.* at 60:6-9.) Bullard testified that Harris appeared to understand, and to the best of Bullard's recollection, did not pursue the issue further. (*Id.* at 60:14-22.) However, Bullard could not recall if he specifically informed Harris that he was not filing a suppression motion. (*Id.* at 59:3-6.)

Bullard maintained that he explained the penalty provisions applicable to both the initial and superseding indictments to Harris, including the effect of mandatory minimum sentences. (*Id.* at 61:20-25.) "[W]e had a discussion about the length of time." (*Id.* at 62:17.) Bullard informed Harris that the sentences on the two 924(c) counts must run consecutively with each other. (*Id.* at 62:18-24.)

According to Bullard, up to the point when the superseding indictment was returned, Harris neither authorized him to accept the ten year plea deal nor gave him "a number to try and push for." (*Id.* at 63:22-64:4.) Bullard counseled Harris to consider the ten-year plea offer, but never pushed him to accept it. His policy was to allow clients to make "an informed decision." (*Id.* at 64:19-24.) Bullard added that Harris "seemed focused on trying to try the case." (*Id.* at 64:12-13.)

Bullard acknowledged on cross-examination that based on his initial conversation with Harris, prior to reviewing the search warrant, he thought there may have been a basis to file a motion to suppress. Once he examined the warrants, "it kind of foreclosed some options for us in that regard." (*Id.* at 68:2-8.) Bullard outlined to Harris the "weaknesses for us in this case" and advised him to "consider offers" but "never pushed

9

Mr. Harris to take any plea . . . ." (*Id.* at 71:23-25.)[6] As Bullard recounted on direct examination, he advised his client "[i]f you want to fight this case and go to trial, I'm happy to stand by you and we'll do whatever we have to do to fight this case. But, you know, you need to weigh out whether or not, you know, this is worth the risk." (*Id.* at 65:6-9.) Bullard, who neglected to bring his file to the evidentiary hearing, appeared to specifically recall these conversations.[7]

In his post-hearing memorandum, Harris challenges the adequacy of Bullard's representation on multiple fronts. Central to each of his allegations is the substance of conversations between Harris and Bullard. Unfortunately, the Court's analysis of these critical conversations is somewhat hampered by the absence of any notes memorializing such discussions. On the other side of the ledger, pertinent intercepted telephone conversations played to the jury during Harris's trial, cast serious doubt on Harris's purported interest in considering any plea offer. These communications were recorded, in accordance with published policy, at the Northern Neck Regional Jail, where Harris was confined awaiting trial. The conversations with his associates arguably reveal that Harris, unknown to Bullard, was busy crafting his own trial strategy built around fabricated testimony. (Gov't's Response to Suppl. Br. 12–13.)

In a conversation recorded on May 25, 2011 at 1:03 p.m., Harris suggests to an unknown individual that another person in the house which was the subject of search

---

[6] Harris did not deny that Bullard informed him that the government had two witnesses willing to testify that Harris sold them drugs. (*Id.* at 20:11-13.) Bullard also let Harris review transcripts of recorded incriminating phone calls. (*Id.* at 23:11-13.)

[7] Bullard admitted that his license to practice law had been suspended twice by the Virginia State Bar for failing to timely perfect appeals. (*Id.* at 72:19-73:15.)

warrant should claim ownership of the drugs seized. Harris informed the person with whom he was conversing that,

> Being that he already got charged with this shit, he got a simple possession, he got, if he own up to the shit then he can't get charged again 'cause it would be double jeopardy, you know what I'm sayin'? . . . I ain't gonna worry about the shit. That why I turned the plea down and shit, they tried to come at me with a three year plea, but then they told me they got these motherfuckers that is willing to testify.

(Gov't's Response to Suppl. Br., Ex. 2.)

On June 3, 2011, five days before the Superseding Indictment was returned, Harris had another recorded conversation with an unknown individual. In that conversation, Harris said, "[m]y lawyer came and see me yesterday and my fingerprints or my DNA ain't come up on none of that shit they found in the house in Prince George." (Gov't's Response to Suppl. Br., Ex. 3.) Harris continues, "I need Mr. Roach to make a sworn statement too, saying that I wasn't the . . . lease holder of the house . . . ." (*Id.*) Mr. Roach and his wife were the owners of the property which was the subject of the search warrant in Harris's case. (Gov't's Response to Suppl. Br., Ex. 4.) The rental agreement clearly reflects that Cory D. Harris was one of the lessees of that property. (*Id.*)

In *Missouri v. Frye*, the United States Supreme Court reiterated that the Sixth Amendment right to effective assistance of counsel applies to all critical stages of criminal proceedings, including the consideration of plea offers that lapse or are rejected. 566 U.S. 134, 140 (2012). The court in *Frye* also emphasized that the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective assistance claims in the plea bargain context. *See Frye*, 566 U.S. at 140; *Hill v. Lockhart*,

474 U.S. 52, 57 (1985). The negotiation and acceptance of a plea offer is a critical stage of the proceedings during which the right to counsel adheres. *Lafler v. Cooper*, 566 U.S. 156, 177 (2012).

To prevail on a petition alleging ineffective assistance of counsel under 28 U.S.C. § 2255, a petitioner must first show that counsel's representation was deficient, and second, that the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. To satisfy the deficient prong of *Strickland*, the defendant must overcome the "strong presumption" that counsel's strategy and tactics fall "within the wide range of reasonable professional assistance." *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).[8] This requires a defendant to show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

As to prejudice, a defendant must show that there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

---

[8] As Justice Kennedy noted in writing for the Court in *Premo v. Moore*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." 562 U.S. 115, 659 (2011) (internal quotation marks and citations omitted).

12

As the Supreme Court stressed in *Strickland*, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 446 U.S. at 689.

In analyzing ineffective assistance of counsel claims, the Court need not determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Strickland*, 466 U.S. at 697. To prove an actionable claim, Petitioner must demonstrate a "reasonable probability of a different outcome." *Lenz v. Washington*, 444 F.3d 295, 303 (4th Cir. 2006) (internal citations and quotation marks omitted). Assuming that Harris had a sincere interest in exploring a negotiated disposition of his case, prejudice is obvious—Harris received a sentence of fifty years, rather than the ten years offered by the expired plea offer. "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to . . . the imposition of a more severe sentence." *Lafler*, 566 U.S. at 168.

In the context of plea negotiations, the Supreme Court in *Frye* articulated the standard to be used by trial courts in evaluating the deficient performance prong of *Strickland*.

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it . . . .

13

*Frye*, 566 U.S. at 147. Given the nuanced art of plea negotiations, reviewing courts have been reluctant to define detailed standards for the proper discharge of defense counsel's participation in the process. *Premo*, 562 U.S. at 125. Moreover, the Court in *Premo* cautioned reviewing courts to be mindful of the "potential for the distortions and imbalance that can inhere in a hindsight perspective." *Id.*

However, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145. In the immediate case, a favorable plea offer was unquestionably placed on the table by the prosecutor. At issue is whether it was timely conveyed, adequately explained, and its value properly assessed in light of the imminence of a superseding indictment. The superseding indictment included firearms offenses carrying mandatory minimum sentences three times the proposed plea offer. Of course, the Court must also determine Harris's bona fides.

Harris maintained as well that Bullard's representation fell short of being objectively reasonable in failing to competently evaluate and articulate the strength of the government's case and likelihood of conviction. When communicating a plea offer, counsel "should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000). Lastly, Harris contends in his post-hearing memorandum that Bullard had an obligation to encourage him to accept the plea deal as opposed to simply suggest that he seriously consider it.

While the United States Court of Appeals for the Fourth Circuit has uniformly applied the teachings of *Strickland* and embraced the requirement that counsel advise the client of the strengths and weaknesses of a prosecutor's case, it has never endorsed the notion that counsel is required to exert undue influence on a defendant's decision. *Jones v. Murray*, 947 F.2d 1106, 1111 (4th Cir. 1991); *see also United States v. Stockton*, 546 Fed. App'x 242 (4th Cir. 2013) (counsel's performance not deficient for failing to vigorously attempt to persuade client to accept plea offer). The Second Circuit adopted the same standard in *Purdy v. United States*, 208 F.3d at 45–46 (counsel must give the client advice on the crucial decision of whether to plead guilty, including the comparative sentencing exposure, but should avoid coercion).[9] Where on the continuum between coercion and counseling the proper level of persuasion lies must necessarily turn on the facts and circumstances of each individual case. Here, aside from the unmeritorious motion to suppress, Harris's guilt by his own admission was clear.

In the final analysis, Harris's petition for collateral relief pits his credibility against that of his attorney. Bullard testified that he informed Harris that he should seriously consider the government's plea offer. Bullard advised his client that there was no good faith basis to challenge the search warrant affidavit. He explained the consequences of rejecting the plea offer.

However, Harris seemed more focused on litigating than negotiating—an impression supported by the recorded conversations. Harris does not deny that he

---

[9] "[T]he lawyer should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *Jones*, 947 F.2d at 1111 (quoting II *American Bar Ass'n Standards of Criminal Justice*, Standard 4-5.1 (2d Ed. 1986 Supp.)).

15

rejected the plea argument with a non-binding recommendation of ten years. He also acknowledged that Bullard explained that the government intended to introduce recorded incriminating conversation and call witnesses attesting to his drug distributor activities.

Weighed against the required preponderance standard, the Court concludes that Bullard's representation was adequately effective. Bullard had no obligation to coerce Harris into negotiating a plea when Harris was disposed otherwise, as the recorded conversations reflect. The Court is convinced that nothing Bullard could have said would have reversed the steadfast course charted by Harris and the outcome of his case. Consequently, Harris was the author of his own fate. Therefore, Harris's Motion to Vacate, Set Aside, or Correct his Sentence Pursuant to 28 U.S.C. § 2255 will be denied.

An appeal may not be taken from the final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(B). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Petitioner has not satisfied this standard. Accordingly, a certificate of appealability will be denied.

16

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: March 3, 2017
Richmond, VA